REGAN, Judge.
The plaintiff, Nowelia Oubichon, instituted this suit against the defendants, The Young Men’s of Honor Benevolent Association, The Young Ladies of Honor Benevolent' Association, lessors, and Joseph White, the lessee of a building situated in McDonoghville, Louisiana, and designated as the “Giant Bar”, endeavoring to recover the sum of $13,583 as damages for personal injuries incurred by her on July 30, 1950, at about 12:30 a.m., at which time she fell and sustained a fracture of her right leg when she hastily attempted to.leave the “Giant Bar” through a rear door or exit, the steps of which were alleged to be missing therefrom.
After the disposal of various exceptions the defendants answered and generally denied that they were guilty of any negligence in the premises and, in the alternative, pleaded the contributory negligence of the plaintiff. ‘
The Board of Administrators of the Charity Hospital of Louisiana at New Orleans intervened and requested that in the event of judgment in favor of plaintiff, • it have, judgment in solido against both litigants for the sum of $835.65, together with attorney’s fees.
From a judgment dismissing plaintiff’s suit she has prosecuted this appeal. The intervention of the Charity Hospital is not now before us since no appeal was taken by it.
The record discloses relatively simple facts leading up to plaintiff’s injury on Sunday, July 30, 1950, at about 12:30 a.m. in the “Giant Bar” which is owned by the-Young :Men,and Ladies-of Hopor Benevolent Associations and leased to Joseph White.
Plaintiff and Osepha Jackson, her-friend, met at plaintiff’s home in 1518 Ursuline Street at 5:30 P.M. on Saturday, July 29, 1950, where they remained until 11:00 P.M., at which time they decided' to visit Osepha’s home in Gretna, Louisiana. Shortly after arriving there they walked over to the “Giant Bar” and seated themselves át a table therein and proceeded to drink the contents of a bottle of beer. Matthew Williams, a mutual friend joined them in having a drink, and, during the course of his visit, Osepha “excused herself” and went to the rest room. The “Giant Bar”, on this Saturday night, was well patronized “200 to 300” people were present and they were being entertained by “music and dancing” in addition to “drinks.” The festivities were apparently in full swing when “the law” (Officer Thibodeaux of the Gretna Police) entered and announced “everybody on the outside. We’re going to close up the joint” and “arrest Joseph White.” The soothing or harsh tone of “the law’s voice” in delivering this proclamation is The subject of some dispute between the litigants — in any event the officer’s expostulation obviously created among the patrons a spontaneous overflow of powerful emotions, the manifestations and ramifications of which are picturesquely described by Joseph White, one of the defendants and lessee of the bar, who related “ * * *• when the law come there to arrest me * * * everybody did rush and scramble out of the place * * * they started running and jumping-out, the windows and doors and, everywhere; and they broke the windows and front door down and back door * * * and everything getting out of there.”
Osepha Jackson related that she was standing at the bar when a policeman entered the hall and said “everybody get outside and the people started running and the tables started tumbling down * * * I *589 just ran * * * jumped the fence and went over and hid underneath a house # ifc * »
Matthew Williams, who was sitting with the plaintiff when the mass evacuation was precipitated by “the law’s” ultimatum, related that prior to his arrival at about midnight at the “Giant Bar”, he had patronized the “Brown Bomber” and the “Jive Spot.” When he reached the “Giant Bar” he walked over to the table to talk to his cousin, Osepha Jackson, who subsequently left the table and he continued his conversation with the plaintiff. It was about this,time that “the law” arrived and said “everybody on the outside. We’re closing up the joint.” He then stated “the people started running out the place * * * when I looked around * * * to tell her (plaintiff) not to run * * * she was gone * * * through the side door on the gambling room side.” He next saw her at “the entrance from the gambling room into the yard * * * on her hands and knees * * * hollering help me, somebody, please, and people were jumping over her * * * from the sill of the door to the .ground” because there were no steps there.
The plaintiff related that she was sitting at a table in the “Giant Bar” with Matthew Williams when she “heard a lot of noise and excitement and things being knocked over * * * I saw all the people running * * * towards where I was sitting so I got excited and got up. There was a door right there * * * to a little room where they gamble” which was opened and “I went through into this room and I saw another entrance. I was all excited and trying to get out; and I stepped out this other entrance thinking it was a steps there and I fell * * * and my leg was hanging off. I said ‘will someone please help me’ but * * * they just kept running all over me and I couldn’t get up * * * and Matthew Williams came up and said 'who is that’? and T said help me up boy I done broke my leg.’ So he picked me up and was holding my body, and I said somebody hold my foot, because its going to fall off. So Cleveland George come up and he said ‘I’ll hold up her foot and you hold her body * * *.’
,, Cleveland, George related that before “the law” entered upon the scene of the evening’s festivities; he was seated at a table in the gambling, room and after the accident he assisted in removing plaintiff from the situs thereof. He finally asserted that he visited the gambling room of the “Giant Bar” “quite regular * * * many nights I would tell some of the fellows * . * * to watch the steps because there were no steps there.”'
The record reflects an abundance of evidence offered on behalf, of the defendant to the effect that at least two other exits in the “Giant Bar” were available for use by the plaintiff on the night of the accident which were both convenient and safe to use; that the exit through which the plaintiff left the premises was. one which was barred to the patrons of the establishment, the door leading from the bar to the gambling room, according to defendant, White, and other witnesses, was “hooked top and bottom” and the door leading from the gambling room into the street was “nailed” but the “wooden steps” servicing this doorway were intact when the accident occurred.
Plaintiff’s counsel point to the record and assert that it reveals the non-existence of the steps, but they argue even assuming the existence of steps — the defendants are still liable for plaintiff’s injuries, for. the reason that the evidence reflects a prior raid wherein “the patrons had all been jailed” and this raid was indelibly and fearfully impressed on the minds of the patrons participating in the festivities offered by the “Giant Bar” on the morning of the accident; accordingly, the proprietor must reasonably anticipate both the propensities and the probable consequences of the actions of his patrons during the course of a “raid” on the “joint”; therefore, he is obligated to provide adequate facilities for the hasty departure of the patrons.
*590 . Defendants’ counsel, in opposition thereto, insist that the exit used by the plaintiff was barred to the patrons of the establishment on the night of the accident; that the steps servicing this exit were intact; and finally, assuming arguendo, that no steps serviced' this exit plaintiff is barred from recovery because of her negligence which contributed to her injuries, in that she became unnecessarily panic stricken upon the entrance of a policeman in the “Giant Bar” and since the policeman’s arrival did not constitute such an emergency as the law recognizes as an excuse for one’s irrational 'behavior, she was obligated to use the safe and convenient exits in departing from the premises, , . i ;
Pretermitting the determination of whether the door leading from the bar into the gambling room was '“hooked top and bottom” and whether the door leading from the gambling room to the street was “nailed” a simple question of fact poses itself for our consideration ' and that is whether steps serviced' the exit on the morning of the accident?
The trial judge obviously answered this question' affirmatively and our examination of the record discloses no error in his conclusions: The record reflects not only an abundance of evidence revealing the existence of steps servicing the exit in question — but it shows that plaintiff, shortly after the arrival of the policeman, manifested panic and anxiety, which culminated in a spontaneous overflow of powerful emotions causing her to run rather than walk from the doorway into the street and her injuries resulted in consequence of her irrational conduct. The plaintiff’s actions are not to be condoned on the hypothesis that the policeman’s entrance into the bar constituted such, an emergency as would warrant a manifestation of emotional behavior emanating from the mind of a reasonably prudent person.
For the reasons assigned the judgment appealed from is affirmed.
Affirmed.